**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**
**EAST ST. LOUIS DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CRIMINAL NO. 3:24-cr-30070-1-DWD |
| | ) | |
| TYLANN J. STARKS, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Now comes, The United States of America, by and through, Steven D. Weinhoeft, United States Attorney for the Southern District of Illinois, who provides the Government's Sentencing Memorandum.

## I. OVERVIEW:

Armed with stolen U.S. Postal Service "arrow keys," Tylann Starks and Tiara Johnson systematically stole checks and personal identifying information from U.S. mail receptacles all over the area. Then, they used advanced techniques, such as check washing and forgery to fraudulently obtain funds from federally insured financial institutions.

The operation's complexity is underscored by its prolonged duration, coordinated execution, and reliance on fraudulent identification to perpetrate the fraud. While the documented toll includes at least 103 victims and Guideline losses totaling $116,279.51, this represents only a partial glimpse of the crime's full impact. Those known figures stem almost exclusively from instances where discarded evidence left a traceable footprint, leaving the full breadth of the damage largely unknown.

## II. APPLICATION OF 18 U.S.C. § 3553 SENTENCING FACTORS

A. *Nature and circumstances of the offense*

In December of 2022, the U.S. Postal Service (USPS) began investigating mail thefts from various collection boxes throughout the metro east. The investigation culminated in an indictment charging Tiara Johnson, Tylann Starks, and USPS employee Jamil Jackson with conspiracy to steal US mail (Doc. 2, Count 8, PSR ¶5), among other things.

That conspiracy began on or about February 14, 2020, and continued until February 3, 2023. (Id.) A linchpin of the conspiracy was Starks and Jackson's need to acquire and use specialized USPS "arrow keys" to unlawfully access postal receptacles to steal the mail. (See, Doc. 2, Count 8, PSR ¶2) There were multiple arrow keys used during the conspiracy, and each was obtained by USPS employee and coconspirator Jamil Jackson.

This case was exceptionally difficult to investigate. Afterall, the vast majority of the stolen mail was simply discarded after the thieves didn't find checks or financial documents. It was only on a few occasions that agents were fortunate enough to have witnesses come forward to report the discovery of discarded mail. It was through this type of anecdotal reporting that a thorough investigation was able to follow the breadcrumbs back to the conspirators. But who knows how many birthday cards, letters, pieces of business correspondence, and other undetected stolen checks and financial documents were actually stolen or destroyed by this crew during the conspiracy. And it should also be noted that the thieves didn't limit themselves to stealing mail—as R.C. found out when five (5) checks were stolen from his company's checkbook. (PSR ¶18) Similarly, an area business had one of their checks counterfeited and the money deposited into Marlon Cann's mother's account. (PSR ¶20)

The defendants employed a technique known as "check washing," using chemicals or manual friction to erase the original inked writing—such as payee names and amounts—while

preserving the checks' underlying authenticity. They then rewrote the checks with new dollar amounts and payee designations, often inserting Johnson's name or those of other associates. Other times, the crew obtained fake identifications to enable them to complete the financial transactions. These altered or phony checks were then negotiated at various federally insured financial institutions across southern Illinois and eastern Missouri.

It should also be reiterated that Starks fled the scene in a reckless manner when confronted by agents. (See, Government's Objection to the PSR, Sent. Ex. 1) Those facts are fairly considered under §3553(a) as well as under §3C1.2. And her flight in this investigation isn't the first time she's recklessly fled from the police to avoid arrest. On May 10, 2022, Starks was involved in another high-speed reckless chase with Brooklyn police where she fled while in possession of 5 lbs. of marijuna and a 9mm handgun. (Sent. Ex. 2) In that case, she even lied about possessing the gun despite the fact that it literally fell out of her waistband. (Id., p.4)

B. *History and characteristics of the defendant;*

Any assessment of Starks' background begins with a criminal history that includes 10 criminal convictions and countless probation violations that span her adult life. The consistent theme is theft and lying. She has been convicted of stealing, deceptive practices, fraudulent use of a credit device, and now federal identifity theft and bank fraud. Some of her thefts are opportunstic, including stealing while shopping and as an employee, but others are complex and entrepreneurial. She's shoplifted, forged checks, abused credit cards, and even obtained housing by fraud. In short, she has stolen in just about every way a person can pilfer.

At the time of her arraignment, Starks lied about her living arrangements with Marlon Cann because they obtained their housing through fraud. Marlon Cann had signed the lease for the Fairview Heights apartment under a false name, after obtaining a fake ID containing his actual picture, but with the identifying information for his brother, Earl Starks. They used the fake ID to

rent the Fairview Heights address after they previously rented a different apartment in Swansea. In that Swansea rental application, they submitted forged payroll information falsifying their income to qualify for the apartment. Then, they tried to pay the rent with phony money orders and later moved out without paying any rent at all.

Not only did she fraudlulently obtain housing, but Starks also fraudulently obtained her transportation. On or about January 10, 2024—*after she had been caught at the bank but before she was indicted*—Starks purchased a 2021 Genesis GV80 from Napleton Hyundai in Hazelwood for $47,600 in the Eastern District of Missouri. Starks financed the expensive purchase through Ally Financial. When applying for financing, she falsely claimed that she earned $6,200 per month from a job working at Southwest Airlines, and that she had worked at Southwest for more than six years. Every bit of that information is false. (Sent. Ex. 3, p.1) In addition, she forged an insurance card that falsely evidenced coverage that did not exist. (*Id.* p.2)

It would appear that Starks entirely supports herself through criminal activity. The PSR reflects a scant employment record (PSR ¶118-119), and no steady source of income. Nevertheless, gaming records compiled during the investigation revealed that she lost a total of $213,964.91 from five different casinos mostly in 2020-2022. (Sent. Ex. 4) She has demonstrated no legitimate source of income for those losses. One can only infer that cash has come from criminal sources.

That inference of criminalty isn't rank speculation. Rather, it's the only rational conclusion to be formed after reviwing her lifestyle and the evidence collected during the investigation. For example, one need only look at the Brooklyn P.D. phone extraction from her May 2022 arrest for evidence that she was engaged in identity theft at that time. (Sent. Ex. 5)

But a separate phone extraction from this investigation in February 2023 is even more dramatic. The extraction revealed photos of IDs, checks, credit card numbers, bank statements,

and other tools of the trade. One of her bank statements showed a balance of $310,238 and another showed $101,001.35 (Sent. Ex. 6, p. 8, 12) Photos found on her phone show eye-raising amounts of cash, drivers licenses, mulitiple guns, and a bag of apparent narcotics. (Sent. Ex. 6) These photos can only be explained by criminal conduct.

Evidence # IS0001782667
File name: 5005_438



Evidence # IS0001782667
File name: 5005_612



Evidence # IS0001782667
File name: 2EDB3F96-87CF-4543-9C18-11DEE7629C97



Evidence # IS0001782667
File name: 5005_2415




Evidence # IS0001782667
File name: 1A281F34-B007-48CA-863D-C5BD72291FA7



Evidence # IS0001782667
File name: 00ad1778068e929dece4197f1209d20f



Evidence # IS0001782667
File name: 5B86A0F5-B83A-405E-A52C-6D7431B27333



Evidence # IS0001782667
File name: 5FC8D7B1-2F98-4529-A53B-9362D5A6FCFD



This is a lifestyle, not merely a single offense.

And while her criminal activities are somewhat varied, they have one thing in common—a complete inability or unwillingness to comply with the terms of supervision or probation. It would appear that the only time probation or supervision wasn't revoked is when it was simply terminated unsuccessfully.

Another aggravating aspect of this case is that she committed her federal crimes while under a criminal justice sentence. (PSR ¶79) But the Guidelines have been amended, and they no

longer provide for an adjustment for committing an offense while on release unless the offender has seven or more criminal history points. See USSG §4A1.1(e). The only reason Starks didn't meet that criminal history point metric is because USSG § 4A1.1(c) limits criminal history to no more than four points, regardless of the number of convictions a defendant has received resulting in fewer than 60 days imprisonment.

This policy decision by the Sentencing Commission to ignore federal crimes committed while under a criminal justice sentence is entirely misguided (to choose a charitable word), and the Court should use it's authority under *Kimbrough v. United States*, 552 U.S. 85 (2007) to disagree with that absurd result. It is wholly irrational to say that a person with 10 prior convictions can reoffend *while serving a criminal justice sentence*, but that her criminal history isn't serious enough to warrant a consequence for violating the terms of release. That's nonsense. And the Court should quantify the impact of two additional points as if the adjustment had applied.

Tylann Starks is best described as a persistent rule breaker who disregards the law with a sense of defiance or indifference. That certainly squares with her diagnosis of Oppositional Defiant Disorder (ODD). But that teenage diagnosis was for a childhood condition marked by defiance and hostility toward authority, and it offers little insight into her current criminality. While ODD may explain early struggles, psychological research confirms it typically resolves by adulthood with intervention. (DSM-5, 2013) Starks' 10 criminal convictions, spanning theft, fraud, and identity theft, coupled with persistent probation violations, reflect a deliberate, adult pattern of lawbreaking far beyond a childhood diagnosis. ODD does not mitigate her culpability. Rather, it underscores a lifelong indifference to legal constraints, suggesting that rehabilitation is unlikely without unprecedented commitment, which her record wholly lacks. In other words, she's an

unpreptant repeat offender who's going to continue to offend in the future no matter what sentence the Court imposes. The best we can do is incapacitate her for some time.

C. *The Sentencing Guidelines*;

Based upon a total offense level of 18 and a criminal history category of III, the guideline imprisonment range is 33-41 months, but the first aggravated identity theft count (Count 6), requires a mandatory minimum 24 months imprisonment that must be served consecutively, thereby making the effective guideline range 57-65 months. The fine range is $10,000-$100,000

It should be noted that this Guideline range neither adjusts her sentencing range for having committed the offense while on parole, nor for other relevant conduct that the Probation Officer chose not to attribute to her.

D. *The need to avoid unwarranted sentencing disparities among similar defendants*;

Tylann Starks was the driving force behind this criminal enterprise. She is much more culpable for the underyling federal offense than her conspirators. While a role-in-the-offense adjustment is unwarranted, there is still a difference in culpability between the actors.

When comparing criminal histories, Starks' conspirator has one infinitely more serious criminal conviction, but Starks has a lifetime of nonstop criminality of her own. This comparison leads to an interesting question: what is worse, one horrific crime or a lifetime of persistent criminality? Well, they are both unacceptable, and they both deserve serious punishment.

The Defendant should be compared to others throughout the country who have committed this same type of crime. Imposing a guideline sentence is the best way to avoid disparities across the entire federal system. As the Seventh Circuit has said, "we have repeatedly held that a within-guidelines sentence necessarily takes into account unwarranted disparities." See, e.g., *United States v. Matthews*, 701 F.3d 1199, 1205 (7th Cir. 2012). This is because "the ranges are themselves designed to treat similar offenders similarly." *United States v. Boscarino*, 437 F.3d

634, 638 (7th Cir. 2006). Indeed, we have noted that imposing a within-guidelines sentence is the surest way to avoid unwarranted disparities. *United States v. Babul*, 476 F.3d 498, 501–02 (7th Cir. 2007); *United States v. White*, 737 F.3d 1121, 1145 (7th Cir. 2013).

E. *The need to provide restitution to the victims*.

A total of $24,251.54 in restitution was identified, and the defendant has not objection to that finding. The Government will provide the Clerk's Office with a list of addresses and amounts for the restitution recipients.

## III. CONCLUSION:

Like a joyless rewrite of the movie, "Catch Me If You Can," Tylann Starks' life is a chronicle of larceny and lies—stolen checks, forged identities, and at least 103 victims left to bear the cost of her deceit. In the movie, Frank Abagnale acts through charm, not malice. And in the end, he feels guilt when betraying FBI Agent Carl Hanratty, and he demonstrates genuine reform by cooperating with the FBI and walking away from his criminal lifestyle. But unlike Frank Abagnale, Starks offers no such humility and no such promise. Her diversified criminal lifestyle reflects a defiant personality that is cemented and unmoved by consequence. She cannot be reached with an appeal to right and wrong. Rather, she must be deterred and incapacitated.

## IV. SENTENCING RECOMMENDATION:

A. **Imprisonment:** A high-end guideline sentence is appropriate, totaling 65 months' imprisonment is appropriate, structured as follows:

- Count 1 (conspiracy to commit bank fraud), Counts 2, 3, 5 (bank fraud), and Count 8 (conspiracy to steal US mail): 41 months concurrent between these counts, but consecutive to Counts 6 & 7.
- Counts 6 & 7 (aggravated identity theft): 24 months' imprisonment, consecutive to Counts 1, 2, 3, 5, and 8, but concurrent with each other.

B. **Fine:** There would be no purpose served by imposing a fine given the amount of restitution that is due.

C. **Duration of Supervised Release:** Starks presents an obvious risk of recidivism, and a maximum term of supervised release is necessary to protect the public. In addition, and lengthy term is required to maximize restitution. Supervised release should be ordered to run concurrently, as follows:

- Counts 1, 2, 3, and 5 – Five years' supervised release.
- Counts 6 & 7 – One year of supervised release.
- Count 8 – Three years of supervised release.

D. **Restitution:** $24,251.54.

E. **Special Assessment:** $700

Respectfully submitted,

UNITED STATES OF AMERICA,

STEVEN D. WEINHOEFT,

Digitally signed by STEVEN WEINHOEFT
Date: 2025.04.14 23:27:16 -05'00'

United States Attorney
Nine Executive Drive
Fairview Heights, Illinois 62208
(618) 628-3700 telephone
E-mail: Steven.Weinhoeft@usdoj.gov